Robert H. Tyler, Esq., CA Bar No. 179572
rtyler@tylerbursch.com
Nada N. Higuera, Esq., CA Bar No. 299819
nhiguera@tylerbursch.com
Mariah R. Gondeiro, CA Bar No. 323683
mgondeiro@tylerbursch.com
TYLER & BURSCH, LLP
25026 Las Brisas Road
Murrieta, California 92562
Telephone:   (951) 600-2733
Facsimile:    (951) 600-4996

Nicole C. Pearson, Esq., CA Bar No. 265350
npearson@ncpesq.com
LAW OFFICES OF NICOLE C. PEARSON
3345 Newport Boulevard, Suite 200
Newport Beach, California 92663
Telephone:   (424) 272-5526

Attorneys for Plaintiffs RYAN
KHANTHAPHIXAY, RILEY O'NEAL

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RYAN KHANTHAPHIXAY** and **RILEY O'NEAL**, <br><br> Plaintiffs, <br><br> vs. <br><br> **LOYOLA MARYMOUNT UNIVERSITY**; **MUNTU DAVIS**, in his official capacity as Public Health Officer for Los Angeles County; and **BARBARA FERRER**, in her official capacity as Director of the Los Angeles County Department of Public Health, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Ryan and Riley, the plaintiffs herein, are undergraduate students at Loyola Marymount University. Their hard work and academic successes led to their acceptance into the University. That same hard work continued in college, and they are now matriculating into their sophomore and junior years, respectively.

2.      After registering for their Fall 2021 classes, selecting, and securing on-campus housing assignments to live with friends upon their eagerly anticipated return to campus, the University sent a message to Ryan, Riley, and their families imposing a new requirement: all students were required to be vaccinated against COVID-19, or otherwise submit to testing, masking, distancing, and being subject to "other" measures in order to return to campus in the Fall. The University further announced that these newly imposed conditions of attendance were adopted at the behest of, and in coordination with, the Los Angeles County Department of Public Health.

3.      Though the University does allow for certain accommodations for students seeking exemption to the COVID-19 vaccine mandate, the exemptions recognized by the University are limited in scope and conditioned on similarly objectionable conditions. These accommodations have the effect of creating a campus-wide apartheid, with "vaccine-exempted" students required to live in separate dorms, wear face coverings, social distance, submit to surveillance testing, and have their bodily and medical privacy invaded, while their vaccinated peers are free to move about campus without any special conditions or requirements. Simply put, students whose religious convictions and/or medical conditions dictate against them submitting to the vaccine mandate must live as outcasts amongst their peers for at least this academic year, and perhaps the balance of their college careers.

4.      There are no similar conditions tied to any other exemption granted by the University for any other vaccine that it mandates for attendance.

5.     Ryan and Riley bring suit to redress these constitutional and statutory harms, and seek declaratory and injunctive relief and damages.

## PARTIES – PLAINTIFFS

6.     Plaintiff RYAN KHANTHAPHIXAY ("Ryan") is a 19-year-old rising sophomore at Loyola Marymount University. When not in school, Ryan resides with his family in Los Angeles County, State of California.

7.     Plaintiff RILEY O'NEAL ("Riley") is a 20-year-old rising junior at Loyola Marymount University. When not in school, Riley resides with his family in Orange County, California.

8.     Numerous other LMU students object to LMU's newly announced mandates for reasons similar to Ryan and Riley and/or, in some cases, because the student has recovered from COVID-19 and possesses natural immunity. These students have declined to join this lawsuit for fear of potential academic, personal, and professional retribution by the University and/or their peers.

## PARTIES – DEFENDANTS

9.     Defendant LOYOLA MARYMOUNT UNIVERSITY (hereinafter "the University" or "LMU") is an institution of higher learning accredited by the WASC Senior College and University Commission. On its website, the University represents that it "offers rigorous undergraduate, graduate, and professional programs to academically ambitious students committed to lives of meaning and purpose." The University is located in the County of Los Angeles, State of California.

10.     Defendant MUNTU DAVIS is the Public Health Officer for Los Angeles County and is hereinafter referred to as "the Public Health Officer" or collectively with Defendant Ferrer as "the Los Angeles County Department of Public Health" or "LACDPH". The Public Health Officer issues Public Health Orders and asserts jurisdiction over all of Los Angeles County, including the University. The Public Health Officer is sued in his official capacity, only.

11.     Defendant BARBARA FERRER is the Los Angeles County Director of Public Health and is hereinafter referred to as "the Director of Public Health" or collectively with the Public Health Officer as "the Los Angeles County Department of Public Health" or "LACDPH". As such, she (together with the Public Health Officer) is charged with establishing and enforcing public health policy for the entire County of Los Angeles. The Director of Public Health is sued herein in her official capacity, only.

## JURISDICTION AND VENUE

12.     This civil rights action raises federal questions under the United States Constitution, specifically the First, Fourth and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. §1983.

13.     This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. §1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorneys' fees and costs under 42 U.S.C. §1988.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are situated in this judicial district or reside in the State of California in which this judicial district is located, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## RELEVANT FACTS

16.     The University requires students who intend to return and live on campus to complete and submit a housing application and license agreement no later than March 30th preceding the academic year. Ryan and Riley both timely submitted their housing paperwork, and both requested to live in an on-campus apartment with

a designated group of friends. To secure their respective housing assignments, Riley paid his housing deposit on April 5, 2021, and Ryan on May 11, 2021.

17.    Both Ryan and Riley registered for their Fall 2021 classes during the registration period beginning April 1, 2021. To the best of their recollection, Plaintiffs completed registration within the first few days of the registration period.

18.    Following the expiration of these deadlines, and after Plaintiffs and LMU had mutually assented to contractually binding terms of Plaintiffs' return to school in Fall 2021, the LMU Office of the President sent a communication to parents and students advising that it would be implementing a policy requiring all students to be vaccinated against COVID-19 prior to returning to campus for the Fall 2021 semester.

19.    The University further advised:

> We will allow exceptions on a case-by-case basis for students with qualifying medical or religious reasons. Where exceptions are granted, the university may require additional COVID-19 testing, social and access restrictions, quarantining, and other requirements or limitations.

20.    The University justified its mandate by reminding parents, "Please note that vaccine requirements are not new: the university also mandates vaccinations for measles, mumps, and rubella." This is a false equivalency because the MMR vaccine is FDA approved, has been administered for fifty (50) years so the side effects are well-known, and exemptions to the MMR vaccine mandate do not carry with it the unconscionable conditions imposed upon students granted exemption from the COVID-19 vaccine mandate. The University further noted, "Also, we will soon provide further guidance concerning vaccinations for faculty and staff."

21.    On June 11, 2021, the University announced its formal COVID-19 vaccination and return to campus policy, including the opportunity for exemptions. The policy, entitled "Required COVID-19 Vaccination and Exemption Policy For Students" reads, in relevant part, as follows:

> All students are required to demonstrate that they are fully vaccinated prior to the commencement of fall classes. A fully vaccinated individual under this policy has received all required doses of an FDA (or non-U.S. equivalent public health authority) approved SARS-COV-2 (COVID-19) vaccination.
>
> Pfizer-BioNTech (0.3 ml each): two doses at least 3 weeks (21 days) apart, but no more than 6 weeks (42 days)
>
> Moderna (0.5 ml each): two doses at least 4 weeks (24-28 days) apart, but no more than 6 weeks (42 days)
>
> Janssen, Johnson & Johnson (0.5 ml): one dose;
>
> ***
>
> For resident students, failure to register vaccination information by August 6, 2021, and be fully vaccinated by August 20, 2021, will result in the cancelation of their housing license agreement.
>
> ***
>
> Students who wish to request a vaccination exemption for medical or religious reasons must complete the appropriate exemption form available through the Vax LMU system no later than June 30, 2021, for residential students or July 15, 2021, for non-residential students;
>
> ***
>
> Third-party testing managed by LMU COVID Testing will be required for those with an approved exemption. Testing schedules will follow LACDPH guidelines. Issues of non-compliance with testing protocols are referred to LMU Student Conduct for evaluation and potential adjudication.

22.   The University did not identify the COVID-19 vaccination requirements for its faculty or staff.

23.   Upon information and belief, the University has not issued any formal or final vaccination policy for its faculty and staff and University faculty and staff are currently not required to receive a COVID-19 vaccine in order to return to campus.

24.   When applying for an exemption through the "Vax LMU system," as required by the University, students must check boxes indicating their assent to

certain affirmative statements. The portal will not allow submission of the exemption application without students agreeing to the following:

> I acknowledge and agree by being unvaccinated I am at increased risk of acquiring COVID-19 and transmitting it to my fellow students, faculty and staff.

> I acknowledge and agree I will be required and hereby agree to submit to regular COVID-19 testing by the University.

> I acknowledge and agree I will be asked and hereby agree to self-isolate if I test positive for COVID-19 and/or quarantine if I am exposed to a positive case of COVID-19.

> I acknowledge and hereby agree to leave campus if, in the determination of responsible University official(s) there is an outbreak of COVID-19 on campus or in the reasonably adjacent campus community and agree that I will not be allowed to return to campus until authorized by the LMU COVID Support Team.

> I agree to follow, abide by and comply with all health and safety related conditions and accommodation requirements identified from time to time by the University as a condition to granting or continuance of my request for an exemption to the LMU COVID-19 vaccination requirement.

> I agree to and hereby assume all liability arising from my decision not to be vaccinated against COVID-19.

25.    Students who are granted exemptions are also required by the University to be enrolled in the "LMU surveillance testing program".

26.    The University has the following posted on its website (webpage entitled "On-campus COVID-19 Testing Center"):

> The LMU COVID Testing Center provides voluntary surveillance PCR testing** to those who live or work on campus or have campus access. At this time, LMU is unable to extend testing opportunities to family members who do not also live on campus.

27.     The asterisked language above corresponds to the following note found at the bottom of the same page:

> Surveillance testing is defined by public health officials as the testing used to detect transmission hot spots or to better understand disease trends in an environment. It can be an effective method to slow the spread as testing may identify those who are COVID-19 positive and pre-symptomatic or asymptomatic.

28.     There is no other language found anywhere in any of the policies or notices promulgated by the University nor anywhere on the University's website regarding any additional or alternative purpose for the testing that students exempted from the vaccination requirement are required to undergo.

29.     Beneath the verbiage quoted in the above paragraphs, there is a series of questions and answers. The first is, "Who is required to get tested?" The response provided is, "All individuals with campus access who are not confirmed as fully vaccinated in Vax LMU must get tested on campus twice per week, effective June 15. Testing is free, and consists of a self-administered swab approximately 1" into the nostril."

30.     This University webpage also discloses that "LMU Student Health Services and LMU's COVID Support Team will have access to results to provide support for individuals who are COVID-19 positive, facilitate contact investigations, and expeditiously initiate the isolation or quarantine process. Results are also automatically provided to the CDC and the LA County Department of Public Health as mandated."

31.     This webpage also states, "Fully vaccinated individuals are exempt from future testing requirements, once they have submitted proof of documentation to VaxLMU and it has been accepted."

32.     The University is using a "SummerBio test [that] is a molecular RT-PCR type test".

33.     These surveillance testing, masking, distancing, forced quarantine, and forced assumption of liability and attestation requirements are the first of their kind tied to any exemption for any other vaccine mandated by LMU.

34.     LMU requires proof of vaccination of measles, mumps, and rubella as a condition to enrollment.[1]  In the event a student needs or is desirous of obtaining an exemption to one of these required vaccines, the student needs to fill out a one-page request for a medical exemption, signed by his or her healthcare provider, providing the student's name, gender, date of birth, address, phone number, email, Student Identification Number (if any),  Parent / Guardian's Name (if under 18); the contraindication and whether its temporary or permanent; the healthcare provider's contact information and license number; and the parties' signatures.[2]

35.     The only "advisement" that LMU gives to the student seeking an exemption is as follows:

> Be **advised**, an unvaccinated student is at greater risk of becoming ill with the vaccine-preventable disease. An unvaccinated student *may* be excluded from attending school during an outbreak of, or after exposure to, any of these diseases: ***Measles, Mumps, Rubella.***

There are no other policies or representations made on this exemption form that an MMR-exempted student mask, distance, or test for the same.

## Plaintiffs

*Ryan Khanthaphixay*

36.     Ryan was born in 2002. He has lived in the vicinity of Loyola Marymount University his entire life and always considered attending school there after high school.

---

[1] Student Health Entrance Requirements, https://studentaffairs.lmu.edu/wellness/studenthealthservices/studenthealthentrancerequirements/ [as of July 23, 2021].

[2] Student Health Services – Exemption For Required Vaccinations, https://studentaffairs.lmu.edu/media/studentaffairs/shs/Exemption%20to%20Required%20Vaccination%202020-2021.pdf [as of July 23, 2021] (emphasis in original).

37.     Ryan worked hard and attained good grades in high school. He was such a good student that the University offered him a substantial academic scholarship for the entire duration of his college career, which was the determining factor in Ryan selecting LMU Over the other prestigious universities he earned acceptance to. The acceptance and scholarship award letter sent to Ryan by the University is attached hereto as **Exhibit "A"**. Notably, there is no contract provision pertaining to vaccination or any other medical requirement.

38.     Ryan is a devout Christian. This is the first occasion on which he has personally been faced with the decision about whether or not to be vaccinated. Though Ryan was vaccinated as a child, those decisions were made by his parents, and he had no opportunity to weigh in on the decision.

39.     Ryan was upset by the University's vaccination policy because being vaccinated in this instance would conflict with Ryan's sincerely held religious beliefs.

40.     Ryan was relieved to learn that the University stated it would accept requests for religious exemptions.

41.     Ryan drafted his exemption request. In it, he articulated his sincerely held religious beliefs. These beliefs include that his body is a temple of the Holy Spirit and, as such, should be revered and kept pure and holy. He further articulated his objection to the use of aborted fetal cells in the production and testing of vaccines.

42.     Ryan submitted his exemption request on June 20, 2021.  The University rejected Ryan's exemption request on June 23, 2021.

43.     Ryan redrafted the exemption request, this time being even more detailed and citing applicable Scripture, and resubmitted it on June 23, 2021.

44.     Much to his dismay, the University denied his exemption request, again, on June 28, 2021.

45.    Determined not to be forced to violate his religious convictions, Ryan redrafted and resubmitted his written request for religious exemption on June 30.

46.    Once again, the University denied Ryan's exemption request on July 1.

47.    Ryan then began hearing that the University was granting religious exemption requests of students belonging to different religions. As a result, Ryan formed the belief that the University was discriminating against him for his sincerely held Christian beliefs.

48.    On July 10, Ryan called LMU's offices of Human Resources and Student Affairs two and three times, respectively, to lodge a formal complaint of potential religious discrimination.

49.    When Ryan did not hear back from either office, he called LMU's offices of Human Resources and Student Affairs, again, on July 12, to re-submit his complaint of potential religious discrimination.

50.    With the help of the undersigned counsel, Ryan supplemented his exemption request, yet again, and submitted it to the University for reconsideration the same day (July 12, 2021).

51.    The University never responded to any of Ryan's complaints of religious discrimination.

Instead, on July 13, 2021, the University granted Ryan's fourth request for a religious exemption. Upon information and belief, a less persistent student would not have been granted an exemption.

52.    While Ryan is relieved that his request was granted, he remains anxious and fearful of what the upcoming year will hold, since the exemption brings with it additional burdens to which Ryan also objects.

53.    Ryan objects to having his nasal cavity invaded for testing purposes, and to the information derived from his biological material being stored in a database indefinitely and disseminated to governmental agencies and other entities whom the University and/or government deem appropriate. Moreover, Ryan objects to being

forced to cover his face because this, too, conflicts with his religious beliefs. Ryan likewise objects to being made to socially distance from his peers.

54.    Ryan is a healthy young man, has never had COVID-19, and believes that God blessed him with divine health (Psalm 91). Covering his face and taking other measures that undermine this promise of God violates Ryan's deeply held religious beliefs and creates a crisis of conscience for him.

55.    In submitting his exemption request to the University, Ryan was forced to check boxes affirming statements with which he does not agree. Most notably, Ryan had to affirm, "I acknowledge and agree by being unvaccinated I am at increased risk of acquiring COVID-19 and transmitting it to my fellow students, faculty and staff."

56.    Ryan has a sincerely held religious belief that, among other religious reasons, his body is considered to be a temple of God in a spiritual sense and that he should not contaminate his body with this vaccine. He further believes that abortion is against God's intention for life and that because aborted fetal cells have been used in the creation of the presently existing Covid-19 vaccines, taking the vaccine would violate his religious principles.

*Riley O'Neal*

57.    Riley was born in 2001. He is a rising junior at Loyola Marymount University.

58.    Like Ryan, Riley excels academically. In recognition of the asset, he would be to the University, LMU awarded him an academic scholarship that guarantees a substantial financial contribution by the University each year to offset the cost of attendance.

59.    Having already spent two years studying at the University, Riley is at the stage of his education where he has completed all general requirements and prerequisites and is about to delve deep in his chosen area of study: film writing, producing, and stunt coordinating. Changing schools at this time would severely

disrupt his education. Additionally, despite having offers to attend several other prestigious Los Angeles universities, Riley specifically chose to attend LMU because of its renowned School of Film and Television, as well as its contacts and connections with the local Hollywood industry.

60.    Riley was stricken with fear and anxiety when he learned of the University's new policy requiring all students to be vaccinated against COVID-19 in order to return to campus in Fall 2021 because Riley has a medical condition that makes vaccination particularly dangerous to him, even more so than to his peers.

61.    Riley applied for and was granted a medical exemption to the University's vaccine mandate. This was a relief, but it does not come close to alleviating all of his concerns regarding his health and his ability to matriculate at the University.

62.    In order to obtain the medical exemption, and as set forth in detail hereinabove, Riley was required by LMU to indicate his assent to certain terms and conditions to which he actually objects.

63.    Specifically, the University conditioned Riley's (and Ryan's) exemption to the vaccine mandate upon express acceptance of liability for he or any other person on campus contracting COVID-19.

64.    This condition is patently unreasonable and unfair given that Riley is unable to be vaccinated due to his medical condition. Riley was unconscionably made to choose between suffering serious medical complications – up to and including death – if vaccinated and assuming personal legal liability for the health of all his peers and the broader University community. Riley should not be made to assume liability for the illness of others when he has no choice but to decline vaccination, or otherwise put his own life and health in jeopardy.

65.    Riley's coerced "agreement" to accept liability is also unconscionable because vaccinated persons can be carriers of and transmit the virus (see discussion, below). Therefore, the University would never be able to determine the source of

any future COVID-19 infection on campus, and any attribution to Riley or any other unvaccinated person would be unfounded.

66.    Adding to the unconscionability and inequity of the forced acceptance of liability for the prospective illness of others is the reality that the persons for whom Riley (and other vaccine-exempted students) has been forced to assume liability may not take responsibility for their own health themselves. They may have poor diets and be overweight, have poor sleep and exercise habits, partake in drugs and alcohol, and therefore, already be more susceptible to contracting COVID-19, regardless of Ryan or Riley's vaccination status.

67.    As a further condition of exemption, Riley (and all exempted students) will be required to undergo invasive nasal swab (PCR) testing twice weekly. Not only is the PCR test unreliable (as discussed in greater detail hereinbelow), Riley's medical condition can also be adversely impacted by it. Thus, even with the vaccine exemption, Riley is still being forced to undergo a medical intervention against his will that is medically unnecessary and puts his life and health in peril.

### None of the Currently Available Vaccines against SARS-Cov2 Are Approved by the Food and Drug Administration ("FDA")

68.    The University's newly implemented vaccine policy reads as follows:

> All students are required to demonstrate that they are fully vaccinated prior to the commencement of fall classes. A fully vaccinated individual under this policy has received all required doses of an FDA (or non-U.S. equivalent public health authority) **approved** SARS-COV-2 (COVID-19) vaccination. (Emphasis added).

69.    Compliance with this policy is an impossibility since there is no FDA approved COVID-19 vaccine.

70.    All COVID-19 vaccines currently available in the United States remain unapproved products authorized for emergency use only pursuant to 21 U.S.C. §360bbb-3. This is not a semantic distinction. Medical and pharmaceutical products allowed to market pursuant to this provision of law have very real distinctions from

approved products, and accordingly come with explicit, distinct legal restrictions and requirements.

71.    To that end, the Centers for Disease Control and Prevention ("CDC" or "CDCP") has posted on its website fact sheets for each of the available vaccines, with the exception of the vaccine manufactured by AstraZeneca.[3]

The applicable fact sheet is required to be given to each person to whom a COVID-19 vaccine is being administered. Notably, each of the fact sheets plainly state at the top (and again further down on the document), "**There is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19**." (Emphasis added). The fact sheets are collectively attached hereto as **Exhibit "B".**

72.    These fact sheets also make clear that the vaccines, "ha[ve] not undergone the same type of review as an FDA-approved or cleared product."

## Reported Risks of COVID-19 Vaccines

73.    The following information is contained in the Pfizer-BioNTech Fact Sheet:

WHAT ARE THE RISKS OF THE PFIZER-BIONTECH COVID-19 VACCINE?

There is a remote chance that the Pfizer-BioNTech COVID-19 Vaccine could cause a severe allergic reaction. A severe allergic reaction would usually occur within a few minutes to one hour after getting a dose of the Pfizer-BioNTech COVID-19 Vaccine. For this reason, your vaccination provider may ask you to stay at the place where you received your vaccine for monitoring after vaccination. Signs of a severe allergic reaction can include:

• Difficulty breathing

• Swelling of your face and throat

• A fast heartbeat

---

[3] The FDA webpage where the link to this document should be located currently states: "COVID-19 AstraZeneca Vaccine EUA Fact Sheet for Recipients URL is not yet ready.  The manufacturer URL for this document will be provided once that is available.", https://www.cdc.gov/vaccines/covid-19/eua/astrazeneca.html [as of July 21, 2021]

• A bad rash all over your body

• Dizziness and weakness

Myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart) have occurred in some people who have received the Pfizer-BioNTech COVID-19 Vaccine. In most of these people, symptoms began within a few days following receipt of the second dose of the Pfizer-BioNTech COVID-19 Vaccine. The chance of having this occur is very low. You should seek medical attention right away if you have any of the following symptoms after receiving the Pfizer-BioNTech COVID-19 Vaccine:

• Chest pain

• Shortness of breath

• Feelings of having a fast-beating, fluttering, or pounding heart.

Side effects that have been reported with the Pfizer-BioNTech COVID-19 Vaccine include:

• severe allergic reactions

• non-severe allergic reactions such as rash, itching, hives, or swelling of the face

• myocarditis (inflammation of the heart muscle)

• pericarditis (inflammation of the lining outside the heart)

• injection site pain

• tiredness

• headache

• muscle pain

• chills

• joint pain

• fever

• injection site swelling

• injection site redness

• nausea

• feeling unwell

COMPLAINT

• swollen lymph nodes (lymphadenopathy)

• diarrhea

• vomiting

• arm pain

These may not be all the possible side effects of the Pfizer-BioNTech COVID-19 Vaccine. Serious and unexpected side effects may occur. Pfizer-BioNTech COVID-19 Vaccine is still being studied in clinical trials.

74.    The side effects noted in the respective fact sheets for each of the vaccines are the same or substantially similar.

75.    The fact sheet pertaining to the COVID-19 vaccine manufactured by Janssen discloses the following additional side effects of vaccination:

<u>Blood Clots with Low Levels of Platelets</u>

Blood clots involving blood vessels in the brain, lungs, abdomen, and legs along with low levels of platelets (blood cells that help your body stop bleeding), have occurred in some people who have received the Janssen COVID-19 Vaccine. In people who developed these blood clots and low levels of platelets, symptoms began approximately one to two-weeks following vaccination. Reporting of these blood clots and low levels of platelets has been highest in females ages 18 through 49 years.

The chance of having this occur is remote. You should seek medical attention right away if you have any of the following symptoms after receiving Janssen COVID-19 Vaccine:

• Shortness of breath,

• Chest pain,

• Leg swelling,

• Persistent abdominal pain,

• Severe or persistent headaches or blurred vision,

• Easy bruising or tiny blood spots under the skin beyond the site of the injection.

These may not be all the possible side effects of the Janssen COVID-19 Vaccine. Serious and unexpected effects may occur. The Janssen COVID-19 Vaccine is still being studied in clinical trials.

Guillain Barré Syndrome

Guillain Barré syndrome (a neurological disorder in which the body's immune system damages nerve cells, causing muscle weakness and sometimes paralysis) has occurred in some people who have received the Janssen COVID-19 Vaccine. In most of these people, symptoms began within 42 days following receipt of the Janssen COVID-19 Vaccine. The chance of having this occur is very low. You should seek medical attention right away if you develop any of the following symptoms after receiving the Janssen COVID-19 Vaccine:

• Weakness or tingling sensations, especially in the legs or arms, that's worsening and spreading to other parts of the body

• Difficulty walking

• Difficulty with facial movements, including speaking, chewing, or swallowing

• Double vision or inability to move eyes

• Difficulty with bladder control or bowel function

76.     The Vaccine Adverse Events Reporting System (VAERS) is a self-reporting surveillance system designed to monitor adverse events potentially caused by vaccines. It is believed that fewer than one percent (1%) of vaccine adverse events are actually reported to VAERS.[4]

77.     VAERS shows the following data for COVID-19 vaccine adverse events as of July 9, 2021[5]:

• Deaths: 10,991

• Life Threatening: 8,832

• Permanent Disability: 9,274

• Hospitalized: 30,781

• Emergency Room: 59,402

---

[4] *Grant Final Report: Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS)* (December 1, 2007, to September 30, 2010, https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf [as of July 21, 2021].

[5] https://www.openvaers.com; *see also*, https://vaers.hhs.gov/

- Office Visit: 82,535
- Severe Allergic Reaction: 19,814
- Bell's Palsy: 2,885
- Heart Attacks: 3,906
- Myocarditis/Pericarditis: 2,466
- None of the above: 232,570
- Total: 463,456

78.     On average, the number of officially confirmed deaths resulting from vaccination annually is approximately 200. In the mere seven months (since December 2020) that the three COVID-19 vaccines have been available for emergency use, they have proven to be over fifty (50) times more deadly than all FDA-approved vaccines combined.

79.     In addition to the foregoing risks, the efficacy of the currently available vaccines has recently been called into question based upon data coming out of Israel and the United Kingdom. In both countries, upwards of forty percent (40%) of those individuals being hospitalized with COVID-19 have been vaccinated.[6] Therefore, how protective vaccines are to the community at-large is not certain.

### Potential Risks of COVID-19 Infection in Young Adults

80.     In contrast with the serious side effects suffered by many recipients of the vaccine, the threat of severe side effects from the COVID-19 virus itself to college-age students is virtually non-existent:

> For those under 30, the risks of serious morbidity and mortality are close to zero. By contrast, early indications from passive surveillance systems (which call for follow-up investigation) and a June 10 review by the FDA's Vaccines and Related Biological Products Advisory Committee indicated an excess risk for heart

---

[6] S*ee, e.g.*, Israel Minister of Health Dashboard, https://dashboard.health.gov. il/COVID-19/general [as of July 20, 2021]; *60% of all COVID hospitalizations are unvaccinated, says Patrick Vallance* (July 19, 2021, https://news.yahoo.com/how-many-covid-hospitalisation-double-vaccinated-171607939.html [as of July 23, 2021];

inflammation, especially in men 30 and younger [who have received the vaccines]."[7]

81.    According to the CDC, only 0.5% of all cases of COVID-19 in the United States occurred in 18- to 29-year-olds.[8]

## **Real Time Polymearse Chain Reaction ("Rt-Pcr") Test**

82.    The RT-PCR test has emerged as the most common type of test used to determine infection with the SARS-CoV-2 virus.

83.    RT-PCR technology is complex and difficult for a lay person to understand. One scientific article describes it as follows:

> Another significant step in PCR evolution was the development of real-time PCR growth curve analysis, based on monitoring the exponential accumulation of PCR product…[T]hermal cycling instruments with optics capable of measuring fluorescence at every cycle made real-time PCR the preferred method of quantitative analysis.[9]

84.    Dr. Sin Hang Lee, a pathologist who has been practicing for more than forty (40) years as an attending Pathologist at Yale-affiliated teaching hospitals from 1973 to 2003, former Director of the Molecular Diagnostic Section at Milford Hospital Laboratory from 2004 to 2015, and current Director of the Milford Molecular Diagnostics Laboratory, wrote:

> The crucial step in most nucleic acid-based assays is to amplify the target DNA or cDNA in a complex clinical sample. PCR amplification always faces problems caused by inhibitors carried over from the clinical sample. Real-time PCR or qPCR is no exception. No commercial viral RNA extraction kits can remove all PCR inhibitors from the human respiratory tract specimens…Non-target nucleic acid molecules and other PCR inhibitors are usually co-extracted and co-purified along with SARS-

---

[7] *University Vaccine Mandates Violate Medical Ethics* (June 4, 2021) , https://www.wsj.com/articles/university-vaccine-mandates-violate-medical-ethics-11623689220 [as of July 21, 2021].

[8] *CDC COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home [as of July 21, 2021].

[9] *Development and Evolution of PCR* (April 1, 2013), https://www.genengnews.com/magazine/200/development-and-evolution-of-pcr/ [as of July 21, 2021]

> CoV-2 RNA. Inhibition of PCR by host DNA is a well-recognized problem in molecular diagnosis of bacterial infections. These PCR-inhibitory molecules may come from the host cells, and from other viruses, bacteria and fungi normally residing in the human respiratory tract. The nature and quantity of these nucleic acids and inhibitors in the respiratory tract vary from one person to another, and are totally unpredictable. Non-template nucleic acids can affect PCR amplification efficiency, the fluorescent signal growth curve and the cycle threshold (Ct) value in qPCR assays.[10]

85.   Kary Mullis, the inventor of PCR technology, who won a Nobel Prize in 1993 for his invention, stated unequivocally that PCR tests are not an effective diagnostic tool:

> [W]ith PCR if you do it well you can find almost anything in anybody. It starts making you believe in the sort of Buddhist notion that everything is contained in everything else, right? Because if you can amplify one single molecule up to something that you can really measure, which PCR can do, then there's just very few molecules that you don't have at least one single one of them in your body…[I]t's just a process that's used to make a whole lot of something out of something. That's what it is. It doesn't tell you that you're sick and it doesn't tell you that the thing you ended up with really was going to hurt you or anything like that…"[11]

86.   "On February 2, 2020, the CDC was the only place in the country that could perform SARS-CoV-2 tests. But on February 12, the CDC announced that the test was providing inconclusive results. By then, the United States had reported 11 COVID-19 cases. The CDC designed its own test in March 2020. The Food and Drug Administration (FDA) picked a conservative testing strategy, allowing laboratories to use only the CDC test kits distributed under the Emergency Use Authorization (EUA) authority. When the CDC test kits failed by generating many

---

[10] "Testing for SARS-CoV-2 in cellular components by routine nested RT-PCR followed by DNA sequencing", International Journal of Geriatrics and Rehabilitation 2(1):69- 96, July 17, 2020.

[11] *Inventor of PCR Test Said Fauci 'Doesn't Know Anything' And Is Willing To Lie On Television - National File* (https://nationalfile.com/inventor-of-pcr-test-said-fauci-doesnt-know-anything-and-is-willing-to-lie-on-television/ [as of July 21, 2021]

false-positive results, neither a new strategy nor a new test was available for more than two weeks[.]"[12]

87.    The CDC itself admits in its "CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel Instruction Manual" that "[d]etection of viral RNA may not indicate the presence of infectious virus or that 2019-nCoV is the causative agent for clinical symptoms."

88.    In 2020, researchers found that infectivity is related to the date of onset of symptoms and cycle threshold level and that "a binary 'Yes/No approach' to the interpretation RT-PCR test results without validation against viral culture will result in false positives with possible segregation of large numbers of people who are no longer infectious and hence not a threat to public health." The researchers concluded that "Complete live viruses are necessary for transmission, not the fragments identified by PCR. Prospective routine testing of reference and culture specimens and their relationship to symptoms, signs and patient co-factors should be used to define the reliability of PCR for assessing infectious potential. Those with high cycle threshold are unlikely to have infectious potential." [13]

89.    In spite of all of the known flaws of the test, on "June 13, 2020 [the] CDC initiate[d] PCR test-based strategy requiring all patients that need hospitalization for any reason be tested at time of entry regardless of symptoms. A patient testing positive is categorized as a new COVID-19 case and hospitalization. Patients testing positive are required to be PCR tested every 24 hours until they have 2 consecutive negative PCR tests at least 24 hours apart. There are no data collection guidelines within the CSTE Position Paper adopted by the CDC on April 14, 2020, to prevent the same patient being counted multiple times. Additionally, there are no

[12] "Testing for SARS-CoV-2 in cellular components by routine nested RT-PCR followed by DNA sequencing", International Journal of Geriatrics and Rehabilitation 2(1):69- 96, July 17, 2020.

[13] Jefferson, Spencer, et. al., Viral cultures for COVID-19 infectious potential assessment – systematic review (Dec. 3, 2020).

data collection guidelines published separately by the CDC to explicitly prevent the same hospitalized patient from being inaccurately counted as a new case and hospitalization each time they are tested while hospitalized…Over this [next] 34-day time period using the CDC test-based strategy nationwide, current hospitalizations more than doubled while 678,720 Americans recovered, and 21,323 Americans passed away."[14]

90.   Use of the RT-PCR test to diagnose infection with COVID-19 is currently prohibited in dozens of countries.

91.   In November 2020, a Portuguese appeals court ruled that PCR Tests are unreliable and that it is unlawful to quarantine people based solely on their PCR test results. Citing Jaafar et al., 2020, the Court found that the reliability of the PCR test depends on the cycle threshold used and the viral load present. The Court noted, "[I]f someone is tested by PCR as positive when a threshold of 35 cycles or higher is used (as is the rule in most laboratories in Europe and the US), the probability that said person is infected is less than 3%, and the probability that said result is a false positive is 97%." The Court also noted, "Given how much scientific doubt exists — as voiced by experts, i.e., those who matter — about the reliability of the PCR tests, given the lack of information concerning the tests' analytical parameters, and in the absence of a physician's diagnosis supporting the existence of infection or risk, there is no way this court would ever be able to determine whether C was indeed a carrier of the [virus], or whether A, B and D had been at a high risk of exposure to it."[15]

92.   In Austria, following Portuguese, German, Dutch, and Pilipino suit, the Vienna Administrative Court held on March 24, 2021, that "a PCR test is not suitable for diagnosis and therefore does not in itself say anything about the disease or

---

[14] "COVID-19 Data Collection, Comorbidity & Federal Law: A Historical Retrospective", Science, Public Health Policy, and The Law Volume 2:4-22, October 12, 2020.

[15] COVID PCR test reliability doubtful – Portugal Judges, The Portugal News (Nov. 27, 2020), https://www.theportugalnews.com/news/2020-11-27/covid-pcr-test-reliability-doubtful-portugal-judges/56962 [as of July 13, 2021].)

infection of a person." The Court also held that the "information" put forth by the Vienna State Police Department of PCR Test results to justify lockdowns "did not contain any valid and evidenced-based findings[.]"[16]

93.    On June 25, 2021, the World Health Organization ("WHO") announced that, "Widespread screening of asymptomatic individuals is not a currently recommended strategy due to the significant costs associated with it and the lack of data on its operational effectiveness."[17]

## **SummerBio's RT-PCR Test**

94.    At the outset of the COVID-19 pandemic, the FDA adopted a policy allowing commercial entities and laboratories to develop tests to detect the presence of the SARS-CoV-2 virus and utilize those tests pursuant to Emergency Use Authorization as defined in 21 U.S.C. §360bbb-3. That policy is attached hereto as **Exhibit "C"**.

95.    Laboratory developed tests are authorized by and regulated pursuant to the Clinical Laboratory Improvement Amendments or "CLIA".

96.    Pursuant to CLIA, laboratories are permitted to begin utilizing the tests they develop prior to receiving even Emergency Use Authorization from the FDA. However, the FDA guidance issued to CLIA-certified laboratories directs them to validate the accuracy of their tests prior to use and notify the FDA once the validation is complete, and to seek Emergency Use Authorization of the product within fifteen (15) days thereafter.

97.    In addition to this process, the federal government issued a policy in March 2020 allowing individual states to authorize labs to develop and perform diagnostic testing without the oversight of the federal government. The FDA has

---

[16] *Austrian Court Rules PCR Test Not Suitable For COVID-19 Diagnosis And That Lockdowns [Have] No Legal Basis,* GreatGameIndia Journal on Geopolitics & International Relations (Apr. 8, 2021), https://greatgameindia.com/austria-court-pcr-test/ [as of July 13, 2021].

[17] *Recommendations for national SARS-CoV-2 testing strategies and diagnostic capacities* (June, 25 2021) World Health Organization, https://apps.who.int/iris/rest/bitstreams/1352897/retrieve [as of July 15, 2021].)

requested that laboratories operating pursuant to state authorization and not seeking an EUA still notify the FDA that it is performing PCR testing and of the clinical trials being performed to verify the accuracy of these tests, but it is not required.

98.   The SummerBio RT-PCR test being utilized by LMU and the LACDPH is listed on the FDA's website as "Not FDA Authorized".[18]

99.   The University has a document linked to its website labeled "Fact Sheet for the SummerBio RT-PCR test", which has a statement contained therein that the test has been authorized for emergency use by the FDA. This would seem to be an intentional misrepresentation being perpetrated by the University. The "Fact Sheet" is attached hereto as **Exhibit "D"**.

100.   This same document contains other noteworthy information. Specifically, the Fact Sheet states, "The SummerBio High-Throughput Triplex SARS-CoV-2 is authorized for use on respiratory specimens collected from individuals **suspected of COVID-19 by their healthcare provider**." (Emphasis added).  In other words, the test is not to be used for the type of community-wide "surveillance testing" the University and LACDPH intend to use it for, nor is it to be used on asymptomatic individuals, nor without the express recommendation of healthcare provider of the prospective test subject.

101.   The Fact Sheet also makes clear that, "Laboratory test **results should always be considered in the context of clinical observations and epidemiological data** in making a final diagnosis and patient management decisions."[19] This means no person should ever be diagnosed with COVID-19 infection based upon PCR test results alone.

---

[18] Notifications and Emergency Use Authorizations: FAQs on Testing for SARS-CoV-2, https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/notifications-and-emergency-use-authorizations-faqs-testing-sars-cov-2 [as of July 21, 2021].

[19] *Ibid.* (emphasis added).

## None of the Currently Available Masks to Prevent the Transmission of SARS-Cov2 Are Approved by the FDA

102.   On April 18, 2020, the FDA issued an EUA authorizing the use of face masks by members of the general public, including health care personnel in healthcare settings as personal protective equipment, to cover their noses and mouths to prevent the spread of SARS-CoV-2, pursuant to 21 U.S.C. 360bbb-3.[20]

103.   In the EUA for surgical and/or cloth masks, the FDA states, "labeling must **not** state or imply... that the [mask] is intended for antimicrobial or antiviral protection or related, or for use such as infection prevention or reduction." [21]

104.   The April 18 EUA also specifically provides that facemasks are not intended to be used by health care personnel in the healthcare setting as protective personal equipment because they "are neither substitutable for respiratory protective devices such as filtering face piece respirators, nor for surgical face masks." [22]

105.   The FDA only authorized the use of face masks if the following conditions were met[23]:

Labeled accurately to describe the product as a face mask and include a list of the body contacting materials (which does not include any drugs or biologics);

Labeled accurately so that it does not claim to be intended for use as a surgical mask or to provide liquid barrier protection;

Include recommendations against use in a clinical setting where the infection risk level through inhalation exposure is high;

Not labeled in such a manner that would misrepresent the product's intended use, for example, the labeling must not state or imply that the product is intended for

---

[20] *Emergency Use Authorization | FDA* (April 18, 2021) https://www.fda.gov/media/137121/download [as of July 21, 2021].

[21] *Ibid.* (emphasis added).

[22] *Ibid.*

[23] *Ibid.*

antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction;

Not labeled as a respiratory protective device, and therefore not be labeled or used for particulate filtration; and

Not labeled for use in high-risk aerosol generating procedures.

106.   On April 24, 2020, "in response to questions and concerns" received by the FDA following its April 18 EUA for masks, the FDA concluded that revising the April 18, 2020 EUA was appropriate "to protect the public health or safety under section 564(g)(2)(c) of the Act (21 U.S.C. § 360bbb 3(g)(2)(c))" and reissued the April 18 EUA in its entirety with amendments, including "clarifying" that "eligible facemasks **are to be used for source control only**, and are **not** personal protective equipment, meaning they are **not** a substitute for filtering face piece respirators or for surgical face masks." [24]

107.   The FDA defined "source control" as the use of a facemask or cloth face covering "to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19," and "respiratory secretions" as those produced when speaking, coughing, or sneezing. [25] In other words, per the FDA, face masks and coverings are only authorized to prevent the transmission of the virus via respiratory secretions, not airborne particles.

**Masks Cause More Harm Than They Prevent**

108.   Since April 2020, it has been proven that standard cloth and surgical masks offer little-to-zero protection against virus-sized particles or small aerosols.

---

[24] *Emergency Use Authorization | FDA* (April 24, 2021)
https://www.fda.gov/media/137121/download (fn. 6, emphasis added);
https://www.fda.gov/medical- devices/emergency-situations-medical-devices/faqs-emergency-use-authorization-face-masks-non-surgical

[25] *Ibid.*

A single virion of SARS-CoV-2 is about 60-140 nanometers or 0.1 microns. The pore size in a surgical mask 200-1000x greater than that. The CDC states that "surgical masks do not catch all harmful particles in smoke," and the size of smoke particles in a wildfire are ~0.5 microns, or 5x the size of the SARS-CoV-2 virus.[26] In fact, after reviewing all of the studies worldwide, the CDC found **"no reduction in viral transmission with the use of face masks**." [27]

109. In studies *pre-dating* COVID-19, in some instances by decades, researchers found that wearing masks causes a host of physiological and psychological burdens on the wearer, including but not limited to hypoxemia[28], hypercapnia[29], atherosclerosis[30], systemic inflammation promoting growth of cancer cells[31], anxiety and attachment disorders[32].

---

[26] *Filtration Efficiency of Hospital Face Mask Alternatives Available for Use during the COVID-19 Pandemic* (August 11, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2769443 [since July 23, 2021]; *N95 Respirators and Surgical Masks* October 14, 2009, https://blogs.cdc.gov/niosh-science-blog/2009/10/14/n95/ [as of July 23, 2021]; *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Wearers* (November 19, 2020), https://www.acpjournals.org/doi/10.7326/M20-6817 [as of July 23, 2021].

[27] *Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings – Personal Protective and Environmental Measures* (Jingyi Xiao1, Eunice Y. C. Shiu1, Huizhi Gao, Jessica Y. Wong, Min W. Fong, Sukhyun Ryu, and Benjamin J. Cowling (Volume 26, Number 5, May of 2020) (emphasis added).

[28] *The Physiological Impact of N95 Masks of Medical Staff*, National Taiwan University (June 2005), https://clinicaltrials.gov/ct2/show/NCT00173017 [as of July 23, 2021]; *Preliminary report on surgical mask induce deoxygenation during major surgery* (April 19, 2008), https://scielo.iscii.es/pdf/neuro/v19n2/3.pdf [as of July 23, 2021].

[29] *Ibid.*

[30] *Chronic intermittent hypoxia induces atherosclerosis* (June 15, 2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2176090/ [as of July 23, 2021].

[31] *Nuclear Factor-kB: The Enemy Within* (September 2004), https://www.sciencedirect.com/science/article/pii/S1535610804002442 [as of July 23, 2021].

[32] *Recognition of facial emotions of varying intensities by three-year-olds. Developmental Psychology,* Bayet, L., Behrendt, H., Cataldo, J., Westerlund, A., & Nelson, C. (2018). 54(12), 2240-2247; Annotation: Development of facial expression recognition from childhood to adolescence: Behavioural and neurological perspectives. Journal of Child Psychology and Psychiatry, Herba, C., & Phillips, M. (2004). 45(7), 1185-1198.

110.   As recently as May 2021, student athletes have collapsed during practice and competitions and have even flatlined and needed to be resuscitated[33], mirroring similar events in China in April and May 2020, over a year ago.[34]

**Asymptomatic Transmission Is Not the Driver of Outbreaks**

111.   Upon information and belief, given that Defendants' policies are silent as to the reasons behind the testing, masking, and segregating requirements, these are presumably, to protect against "asymptomatic transmission" of COVID-19.

112.   According to Dr. Fauci, the Director of the National Institute of Allergy and Infectious Diseases and leading U.S. governmental authority on the COVID-19 pandemic: [35]

> [T]he only thing historically that people need to realize is that, even if there is some asymptomatic transmission, in all the history of respiratory borne viruses of any time, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always the symptomatic person. Even if there is a rare asymptomatic person that might transmit it, an epidemic is not driven by asymptomatic carriers.

## FIRST CAUSE OF ACTION

**Denial Of Civil Rights Under 42 U.S.C. § 1983 (Fourteenth Amendment)**

**(By Plaintiffs against all Defendants)**

113.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 112 as though fully set forth herein.

---

[33] *Prineville teen collapses at HS basketball practice; player, mother say mask to blame* (May 12, 2021), https://ktvz.com/news/coronavirus/2021/05/12/prineville-girl-collapses-at-hs-basketball-practice-she-her-mother- and-doctor-blame-mask/ [as of July 23, 2021]; *Oregon HS coach demands end to mask mandate after athlete collapses: "We're talking about oxygen needs"* (April 29, 2021), https://www.foxnews.com/us/oregon-hs-coach-demands-end-to-mask-mandate-after-athlete-collapses-were-talking-about-oxygen-needs [as of July 23, 2021].

[34] *Two Chinese boys reportedly die within a week of each other while wearing face masks in gym class* (May 7, 2020), https://www.nydailynews.com/coronavirus/ny-coronavirus-two-chinese-boys-die-face-masks-gym-class-20200507-ruyinz7czjbqde3tprx647q3dm-story.html [as of July 23, 2021].

[35] Update on the New Coronavirus Outbreak First Identified in Wuhan, China (January 28, 2020) https://youtu.be/w6koHkBCoNQ [as of July 23, 2021].

114.   This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United State Constitution.

115.   The Equal Protection Clause of the Fourteenth Amendment guarantees all Americans the equal protection of law: "One of the fundamental goals of the Equal Protection Clause [is] the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." *Plyler v. Doe* (1982) 457 U.S. 202, 221-222.

116.   The Equal Protection Clause protects individual persons as much as it does groups or classifications of persons. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1* (2007) 551 U.S. 701, 743.

117.   The Equal Protection Clause applies to government actors, or to private actors acting under color of state law. "Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.* (9th Cir. 1989) 865 F.2d 1539, 1540. Here, the University is acting as an agent of the LACDPH in implementing the policies complained of herein including, but not limited to, "surveillance testing" of unvaccinated students.

118.   Plaintiffs are being deprived by Defendants and their policies of equal protection under the law as guaranteed to them by the Fourteenth Amendment to the United States Constitution. Specifically, Ryan, Riley, and other students unable to comply with the University's vaccine requirement on religious or medical grounds (as permitted by well-established law and the University's stated policy), are being forced to live in segregated housing, hide their smiles and other facial expressions from their peers, and be subjected to "surveillance testing". This testing may lead to additional segregationist measures such as removal from campus and forced quarantine. Vaccinated students, on the other hand, will not be subject to these or any special requirements even though the vaccines are not 100% effective and are

possibly entirely ineffective against new strains of the virus said to be more prevalent currently than the original strain.[36]

119.   The University does not condition exemption from the measles, mumps, or rubella vaccines to any similar conditions or requirements or requirements. Therefore, Defendants are treating medically compromised and religious students who are exempted from the COVID-19 vaccine differently and worse than students exempted from any other University-mandated vaccine, based exclusively upon the nature of the vaccine.

120.   Plaintiffs are further being deprived by Defendants and their policies of equal protection under the law as guaranteed to them by the Fourteenth Amendment to the United States Constitution because they are being subjected to the aforementioned offensive, burdensome, and discriminatory conditions based exclusively upon their vaccination status – all in the name of protecting the LMU community – while unvaccinated faculty and staff are not.

121.   Plaintiffs are being discriminated against on the basis of their medical condition and on the basis of their religion and religious beliefs. This deprivation of equal access to education, housing, and other benefits of the University is discriminatory, and Defendants lack a compelling or rational basis for the implementation of such policies. Accordingly, Defendants have violated and continue to violate Ryan's and Riley's right to equal protection under the law, and Defendants' policies cannot stand.

---

[36] Data released from Israel in July 2021 showing that seventy-five to ninety-four percent (75-94%) of new COVID-19 cases in Israel are in those who have been vaccinated (Israel Minister of Health Dashboard, https://dashboard.health.gov.il/COVID-19/general [as of July 21, 2021].

1

## SECOND CAUSE OF ACTION

2 **Deprivation Of Civil Rights Under Article 1, Section 4 Of The California**

3 **Constitution And The First Amendment Right To Free Exercise Under 42**

4 **U.S.C §1983**

5 **(All Plaintiffs Against All Defendants)**

6    122.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1

7 through 112 and 113 to 121 as though fully set forth herein.

8    123.   The First Amendment provides the right of Plaintiffs to the free exercise

9 of religion and Article I, Section 4 of the Constitution of the State of California

10 states, "Free exercise and enjoyment of religion without discrimination or preference

11 are guaranteed."

12    124.   "[T]he religion clauses of the California Constitution are read more

13 broadly than their counterparts in the federal Constitution." *Carpenter v. City and*

14 *County of San Francisco*, 93 F.3d 627, 629 (1996). Courts "therefore review [a]

15 challenge…under the free exercise clause of the California Constitution in the same

16 way [they] might have revied a similar challenge under the federal constitution after

17 *Sherbert*, and before *Smith.* In other words, we apply strict scrutiny." *Catholic*

18 *Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004)

19 (citations omitted).

20    125.   LMU's COVID-19 policies are not neutral and generally applicable

21 because they exempt employees from the same requirements.

22    126.   LMU's COVID-19 policies constitute a substantial burden on Ryan's

23 free exercise of religion under both the First Amendment and the California

24 Constitution because LMU is denying Ryan, and other similarly-situated students,

25 access to classes, housing, and participation in various aspects of campus life, and

26 otherwise imposing various burdensome and equally-offensive requirements as a

27 condition to granting them access, based solely upon his religious beliefs, which

28 prevent them from participating in the policies. LMU's discriminatory, burdening

policies cannot satisfy strict scrutiny because LMU is allowing other students to live, matriculate, and otherwise fully participate in campus life, without restriction or condition, even though these students also present a threat of COVID-19.

127.   LMU's religious exemption review process constitutes a substantial burden on Ryan's free exercise of his Christian faith under the First Amendment and the California Constitution because LMU is denying Ryan, and other similarly situated Christian students the same due process rights and protections in evaluating and deciding whether or not to grant or deny a religious exemption request based solely upon their Christian affiliation. LMU's discriminatory, burdening religious exemption review process cannot satisfy strict scrutiny because LMU is reviewing the religious exemption requests of religious students of non-Christian faith under less stringent standards.

128.   As a result of these violations of Ryan's constitutional rights to exercise his religion, Ryan has suffered damages in an amount to be proven at trial. Ryan is also entitled to recover costs and attorneys' fees under 42 U.S.C § 1983 and under California Code of Civil Procedure § 1021.5 plus injunctive relief and a judicial declaration that LMU's actions were unconstitutional.

## **THIRD CAUSE OF ACTION**

### **Denial Of Civil Rights Under 42 U.S.C. § 1983 (Fourth Amendment)**
### **(By All Plaintiffs against all Defendants)**

129.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 112 as though fully set forth herein.

130.   This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United State Constitution.

131.   The Fourth Amendment of the United States Constitution states that all citizens have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"

132.   The Fourth Amendment applies to government action that intrudes upon an individual's reasonable expectation of privacy. *Katz v. U.S.* (1967) 389 U.S. 347, 361.

133.   Collection of deoxyribonucleic acid ("DNA") or other biologic material from a person constitutes a search and seizure and intrusion into the privacy interests of that person protected by the Fourth Amendment to the United States Constitution. *Skinner v. Ry. Labor Executives' Ass'n* (1989) 489 U.S. 602, 616; *Winston v. Lee* (1985) 470 U.S. 753, 760 (1985); *Schmerber v. California* (1966) 384 U.S. 757, 767-68; *U.S. v. Kincade* (9th Cir. 2004) 379 F.3d813, 821.

134.   "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Maryland v. King* (2013) 569 U.S. 435, 438; *Schmerber*, *supra*, at 768 (internal citations omitted). "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Ibid.;* quoting *Vernonia Sch. Distr. 47J* v. *Acton* (1995) 515 U. S. 646, 65w. In determining whether the intrusion is "reasonable," the Court has preferred "some quantum of individualized suspicion . . . [as] a prerequisite to a constitutional search or seizure." *Ibid.*

135.   Plaintiffs have a reasonable expectation of privacy in their body cavities, as well as in their personal medical, health and genetic information. *See Rakas et al. v. Illinois* (1978) 439 U.S. 128.

136.   Defendants' indiscriminate, mandatory surveillance testing program of all unvaccinated or "exempted" students, regardless of symptomology or exposure, is unsupported by either individualized suspicion or sufficient special needs to justify such any intrusion into their reasonable expectations of physical and personal privacy. As such, Defendants' mandatory surveillance testing program violates

Plaintiffs' Fourth Amendment rights. *See, e.g., B.C. v. Plumas Unified Sch. Dist.* (9th Cir. Sep. 20, 1999, No. 97-17287) 1999 U.S. App. LEXIS 38863, at *22-24.

## FOURTH CAUSE OF ACTION

### Violation Of 21 U.S. Code § 360bbb–3

### (By Plaintiffs against all Defendants)

137.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 112 as though fully set forth herein.

138.   "Under section 564 of the Federal Food, Drug, and Cosmetic Act (FD&C Act), when the Secretary of HHS declares that an emergency use authorization is appropriate, FDA may authorize unapproved medical products or unapproved uses of approved medical products to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by [chemical, biological, radiological, and nuclear] threat agents when certain criteria are met, including there are no adequate, approved, and available alternatives."[37]

139.   The relevant portion of the FD&C Act, found at 21 U.S. Code § 360bbb–3(e)(1)(A)(ii), imposes the following conditions on the dissemination of products that have received emergency use authorization:

> Appropriate conditions designed to ensure that individuals to whom the product is administered are informed:
>
> (I)    that the Secretary has authorized the emergency use of the product;
>
> (II)    of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
>
> (III)    of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

---

[37] *Emergency Use Authorization | FDA,* https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization [as of July 21, 2021].

140.   Defendants and their policies are in violation of 21 U.S. Code § 360bbb–3(e)(1)(A)(ii) (III) by failing to provide the required option to refuse PCR testing and the use of masks to prevent the transmission of SARS-CoV-2.

## FIFTH CAUSE OF ACTION

### Deprivation Of Equal Protection Under Article 1, Section 7(A) Of The California Constitution

**(By Plaintiffs against all Defendants)**

141.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 112 and 113 through 121 as though fully set forth herein.

142.   Article I, Section 7(a) of the California Constitution provides, "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws."

143.   Defendants have violated Plaintiffs' right to Equal Protection afforded to them under Article 1, Section 7(a) of the California Constitution, as described hereinabove in relation to Plaintiffs' claim for violation of the Fourteenth Amendment, including but not limited to being forced to live in segregated housing, masking, being subjected to "surveillance testing", and being subject to force quarantine procedures, while their unvaccinated peers and University faculty and staff are not.

## SIXTH CAUSE OF ACTION

### Deprivation Of Privacy Under Article 1, Section 1 Of The California Constitution

**(By Plaintiffs against all Defendants)**

144.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 112 as though fully set forth herein.

145.   Article I, Section I of the California Constitution recognizes that "[a]ll people are by nature free and independent and have inalienable rights" including "pursuing and obtaining…privacy."

146.   'Privacy' was added by ballot initiative in the 1972 general election. The argument put forth by the legislature in support of this amendment to the state Constitution included:

> The proliferation of government snooping [a]nd data collecting is threatening to destroy our traditional freedom. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create "cradle-to-grave" profiles on every American. At present there are no effective estraings on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[38]

147.   The Restatement (Second) of Torts, Section 652B provides, "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

148.   Plaintiffs herein are reasonable persons who find the intrusions caused by PCR testing, face coverings, the mandated collection and dissemination of personal health data and other biological and genetic information all to be highly offensive and unacceptable intrusions into their respective zones of privacy and, therefore, these requirements violate their right to privacy protected by the California Constitution.

## SEVENTH CAUSE OF ACTION

### Breach Of Contract

### (By Plaintiffs against Defendant Loyola Marymount University, Only)

149.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 112 as though fully set forth herein.

150.   Plaintiffs, and each of them, entered into written contractual relationships with the University upon their acceptance and enrollment into the

---

[38] http://law.scu.edu/wp-content/uploads/art_i_section1_cal_cnstn.pdf [as of July 21, 2021].

University, and, again, upon executing their 2021-2022 housing agreements; paying their housing deposits; and registering for on-campus housing (hereinafter collectively "the Agreements").  Pursuant to the express, unambiguous terms of the Agreements, Plaintiffs are entitled to full, unfettered access to all University facilities and programs, and to the agreed-upon University housing.

151.   Plaintiffs performed all, or substantially all, of the things that the Agreements required them to do, or were otherwise excused from doing these things. All conditions required by the Agreements for University's performance had occurred.

152.   After Plaintiffs and LMU entered into the Agreements, and after Plaintiffs performed, LMU attempted to add terms to the Agreements to which Plaintiffs did and do not agree.

153.   The University has breached the Agreements by failing honor the terms of the Agreements as written, and by attempting to add terms to the Agreements without Plaintiffs' consent.

154.   The University has not performed or been excused from performing under the terms of the Agreements.

155.   As a proximate result of the University's breaches, and each of them, Plaintiffs have been damaged by being deprived of their housing placements and not being allowed to attend University without being subjected to the extra-contractual terms coercively and unlawfully placed upon them. Plaintiffs have also been financially damaged in an amount to be proven at trial with interest thereon at the maximum rate permitted by law.

156.   Upon information and belief, Plaintiffs are entitled to recover attorneys' fees and costs incurred against LMU pursuant to the terms of these Agreements.

## REQUEST FOR JURY TRIAL

Plaintiffs request a jury trial on matters that may be so tried.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.    That this Court issue a Temporary Restraining Order, Preliminary Injunction, and a Permanent Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in concert or participation with them, from enforcing their vaccination policy as described herein; and,

B.    That this Court issue a Temporary Restraining Order, Preliminary Injunction, and a Permanent Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in concert or participation with them, from mandating those students exempted from the University's vaccine mandate to submit to PCR or other laboratory testing, collection of their personal bodily fluids for any COVID-19 related purpose, or masking; and,

C.    That this Court issue a Temporary Restraining Order, Preliminary Injunction, and a Permanent Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in concert or participation with them, from collecting and disseminating via VaxLMU System or any other similar database or portal any and all health information of students, including, but not limited to, vaccination status and results of PCR testing; and,

D.    That Plaintiffs be awarded monetary damages for breach of contract against Loyola Marymount University, in an amount to be proven at trial; and,

E.    That this Court declare Plaintiffs are a prevailing party and award Plaintiffs the reasonable costs and expenses of this action, including reasonable attorney's fees in accordance with 42 U.S.C. §1988, or other applicable statute or law; and

1    F.    That this Court grant such other and further relief as this Court deems
2    equitable and just under the circumstances.

3

4                                        Respectfully submitted,

5                                        TYLER & BURSCH, LLP

6    Dated: July 24, 2021               /s/ Robert H. Tyler, Esq.
7                                        Robert H. Tyler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT