Robert H. Tyler, Esq., CA Bar No. 179572
rtyler@tylerbursch.com
Kristina S. Heuser, Esq. (*Pro Hac Vice*)
kheuser@tylerbursch.com
Nada N. Higuera, Esq., CA Bar No. 299819
nhiguera@tylerbursch.com
Mariah R. Gondeiro, CA Bar No. 323683
mgondeiro@tylerbursch.com
TYLER & BURSCH, LLP
25026 Las Brisas Road
Murrieta, California 92562
Telephone:  (951) 600-2733
Facsimile:   (951) 600-4996

Nicole C. Pearson, Esq., CA Bar No. 265350
npearson@ncpesq.com
LAW OFFICES OF NICOLE C. PEARSON
3345 Newport Boulevard, Suite 200
Newport Beach, California 92663
Telephone:  (424) 272-5526

Attorneys for Plaintiffs RYAN KHANTHAPHIXAY, RILEY O'NEAL

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RYAN KHANTHAPHIXAY** and **RILEY O'NEAL**,<br><br>   Plaintiffs,<br>vs.<br><br>**LOYOLA MARYMOUNT UNIVERSITY**; **MUNTU DAVIS**, in his official capacity as Public Health Officer for Los Angeles County; and **BARBARA FERRER**, in her official capacity as Director of the Los Angeles County Department of Public Health,<br><br>   Defendants. | Case No.:  2:21-cv-06000-AB (KSw)<br><br>*Hon. André Birotte, Jr.*<br><br>**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:<br>Time:<br>Courtroom:  7B<br><br>**DEMAND FOR JURY TRIAL** |

1
EX PARTE APPLICATION

**TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that plaintiffs Ryan Khanthaphixay and Riley O'Neal (collectively "Plaintiffs"), make an application to, and move this Court to grant a preliminary injunction and temporary restraining order enjoining Defendant Loyola Marymount University from enforcing its "Required COVID-19 Vaccination and Exemption Policy For Students", and all aspects thereof. The policy is annexed hereto as Exhibit A. A Proposed Temporary Restraining Order is also filed herewith. Plaintiffs respectfully request that verbiage set forth in the Proposed Temporary Order also be utilized for the Preliminary Injunction to be issued by the Court at the appropriate time.

Plaintiffs make this application pursuant to Federal Rules of Civil Procedure Rule 65 and and Civil Local Rule 7-19 based on the following: immediate and irreparable injury would result to the movants if the relief sought herein is not immediately granted as the Policy is set to take effect on August 6, 2021, and Plaintiffs have already been removed from their housing assignments. Plaintiffs' counsel has both notified Defendants' counsel of its intent to make this *ex parte* application and met and conferred with defense counsel, and no resolution was able to be reached.

Respectfully submitted,

TYLER & BURSCH, LLP

Dated: August 3, 2021

/s/ Kristina S. Heuser, Esq.
Kristina S. Heuser

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 6

I. INTRODUCTION ................................................................................................ 6

II. FACTS ................................................................................................................ 6

III. ARGUMENT ..................................................................................................... 6

   A.  STANDARD OF REVIEW ............................................................................ 6

   B.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ...... 8

      1.  Defendants' Surveillance Testing of Students Violates Plaintiffs' Right to be Free from Unlawful Search as Protected by the Fourth Amendment to the United States Constitution ................................................................. 8

      2.  Defendants' Policy Substantially Burdens Plaintiff Ryan Khanthaphixay's Free Exercise of Religion and Is Not Neutral or Generally Applicable ................................................................................ 10

      3.  Defendants' Policy Violates Plaintiffs' Right to Equal Protection Under the Law ............................................................................................. 12

   C.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE NOT GRANTED ... 15

   D.  THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR ............... 16

   E.  A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC INTEREST ................................................................. 18

IV. CONCLUSION ............................................................................................... 19

3
EX PARTE APPLICATION

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*B.C. v. Plumas Unified Sch. Dist.*
   (9th Cir. Sep. 20, 1999, No. 97-17287) 1999 U.S. App. LEXIS 38863 ........... 10

*Brown v. Bd. of Educ.*
   (1954) 347 U.S. 483 ................................................................................. 19

*Chandler v Miller*,
   520 U.S. 305 (1997) ................................................................................. 10

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*
   (1993) 508 U. S. 520 ................................................................................ 13

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................. 16

*Engquist v. Or. Dep't of Agric.*
   (2008) 553 U.S. 591 ............................................................................ 14, 15

*Harvest Rock Church v. Newsom*,
   592 U. S. ––––, 141 S.Ct. 889, 208 L.Ed.2d 448 (2020) ................................ 13

*Jesus Ortega Melendres v. Arpaio*
   (9th Cir. 2012) 695 F.3d 990 ..................................................................... 20

*Kittle-Aikeley v Strong*
   844 F.3d 727 (8th Cir. 2016) ..................................................................... 10

*Los Angeles Memorial Coliseum Com. v. National Football League*
   (9th Cir. 1980) 634 F.2d 1197 ............................................................. 9, 17-18

*McCarthy v. Servis One, Inc.*,
   2017 U.S. Dist. LEXIS 32622 (N.D. Cal. Mar. 7, 2017) .................................. 9

*McGowan v. Maryland*,
   366 U.S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961) .................................... 14

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*
   (2007) 551 U.S. 701 ................................................................................. 16

*Personnel Administrator of Mass. v. Feeney*,
   442 U.S. 256, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979) .................................. 14

*Ross v. Moffitt*,
   417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974) .................................. 14

*Sammartano v. First Judicial District Court,*
  303 F.3d 959 (9th Cir. 2002) .................................................................................. 20

*San Antonio Independent School Dist. v. Rodriguez,*
  411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) ............................................ 14

*Skinner v. Ry. Labor Executives' Assn.,*
  489 U.S. 602 [1989] .............................................................................................. 10

*South Bay,*
  592 U. S. – 141 S.Ct. 716 ..................................................................................... 13

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ................................................................................ 9

*United Steelworkers of Am. v. Phelps Dodge Corp.*
  (9th Cir. 1989) 865 F.2d 1539 ................................................................................ 9

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..................................................................................................... 9

**Statutes**

Civil Local Rule 7-19 ............................................................................................... 2

Federal Rules of Civil Procedure Rule 65 ............................................................. 2

**Other**

Fourth Amendment to the United States Constitution ...................................... 8, 9

Fourteenth Amendment to the United States Constitution ................................. 13

U.S. Const. Amend. I ............................................................................................. 12

5
EX PARTE APPLICATION

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs seek to immediately enjoin Defendants Loyola Marymount University (hereinafter "LMU" or "the University") from acting in concert with the Los Angeles Department of Public Health to unlawfully subject Plaintiffs and other similarly situated students to "surveillance testing" by forcibly collecting the students' bodily fluids without a warrant and without probable cause in violation of the Fourth Amendment to the United States Constitution. Plaintiffs also respectfully request that this Court enjoin Defendants from enforcing all aspects of its "Required COVID-19 Vaccination and Exemption Policy For Students" insofar as it imposes discriminatory restrictions upon Plaintiffs, each of whom are exempt from vaccination on religious and medical grounds, respectively. As set forth hereinbelow, LMU's protocols and policies violate Plaintiffs' First and Fourteenth Amendment rights and, accordingly, the law requires that this Court intervene to forestall these planned and imminent constitutional violations for which there is no other adequate remedy at law.

## II. FACTS

Plaintiffs respectfully refer the Court to and rely upon the following documents to set forth the relevant facts in this matter: Complaint with exhibits (Exhibit B), Declaration of Plaintiff Ryan Khanthaphixay (Exhibit C), Declaration of Plaintiff Riley O'Neal (Exhibit D), and Expert Declaration of Dr. Paul Alexander (Exhibit E).

## III. ARGUMENT

**A.   Standard Of Review**

In determining whether to issue a Temporary Restraining Order and Preliminary Injunction, this Court must consider the following four factors: (1) whether the movant has shown a likelihood of success on the merits, (2) whether there is a likelihood that the movant will suffer irreparable harm in the absence of a

TRO, (3) the balance of the equities tip in the movant's favor, and (4) the TRO is in the public's interest. *See, e.g., Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *McCarthy v. Servis One, Inc.*, 2017 U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017). "In this circuit, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Los Angeles Memorial Coliseum Com. v. National Football League* (9th Cir. 1980) 634 F.2d 1197, 1201. As explained below, Plaintiffs satisfy each of these requirements and, accordingly, are entitled to the requested relief.

The Court will also be asked to determine whether Defendant Loyola Marymount University (hereinafter referred to as "LMU" or "the University") is subject to Plaintiffs' constitutional claims since it is a private institution. Indeed, 42 U.S.C. §1983 is limited in scope to state actors or individuals or entities acting pursuant to state law. In this case, LMU has advertised that is has enacted and is carrying out the challenged Policy at the behest of and in coordination with the Los Angeles County Department of Public Health. "Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.* (9th Cir. 1989) 865 F.2d 1539, 1540. Thus, there can be no doubt that Plaintiffs' causes of action arising under the United States Constitution are viable as against LMU.

B.   **Plaintiffs Are Likely To Succeed On The Merits Of Their Claims**

    1.   <u>Defendants' Surveillance Testing of Students Violates Plaintiffs' Right to be Free from Unlawful Search as Protected by the Fourth Amendment to the United States Constitution</u>

"The Fourth Amendment requires government to respect 'the right of the people to be secure in their persons . . . against unreasonable searches and seizures.'" *Chandler v Miller*, 520 U.S. 305, 308 (1997). It is irrefutable that Defendants' "surveillance testing" implicates the Fourth Amendment because capturing bodily fluid from a person has been deemed by the United States Supreme Court to fall within this scope of review (*see, e.g., Skinner v. Ry. Labor Executives' Assn.*, 489 U.S. 602 [1989]). In fact, such widespread testing of a student body has been struck down on Fourth Amendment grounds by the Eighth Circuit in *Kittle-Aikeley v Strong*, 844 F.3d 727 (8th Cir. 2016). "To be reasonable…a search ordinarily must be based on individualized suspicion of wrongdoing." *Chandler v Miller*, *supra* at 313.

    Plaintiffs are not suspected of any wrongdoing, yet Defendants are requiring them to routinely submit to nasal swabs and collection and testing of their biological material. This is being required of Plaintiffs purely by virtue of the fact that they have exercised their right under the law and pursuant to the University's Policy to adhere to their religious beliefs and their doctors' recommendations, respectively. Plaintiffs have been granted exemption by the University from the mandatory vaccination aspect of its Policy, but the exemption is granted only on condition of Plaintiffs' relinquishing their well-established Fourth Amendment protection to be free in their persons from unreasonable searches and seizures. Mandating these students to submit to collection of bodily fluids, as well as retaining and tracking the information derived from such forcibly collected material, without any suspicion of wrongdoing is precisely the sort of intrusion the Fourth Amendment was designed to protect against.

This Court has held that "a suspicionless search may be reasonable 'in limited circumstances, where (1) the privacy interests implicated by the search are minimal, and (2) where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" *B.C. v. Plumas Unified Sch. Dist.* (9th Cir. Sep. 20, 1999, No. 97-17287) 1999 U.S. App. LEXIS 38863, at *23-24.) (*internal citations omitted*), but has made clear that "the second part of the test requires both the existence of an 'important governmental interest furthered by the intrusion' and that this interest would be 'placed in jeopardy by a requirement of individualized suspicion.'" *Id.* quoting *Chandler, supra* at 314. The University has cited "surveillance" as the only purpose of the testing program, which clearly does not constitute an important government interest in a free society.

Should Defendants contend in their opposition to this application that the "important governmental interest" served by their surveillance testing of unvaccinated students is to identify and contain any outbreaks of COVID-19 on campus, that end is not served by the planned intrusion into Plaintiff's bodily privacy because vaccinated persons are likewise able to be carriers of COVID-19.[1] Also, it has been widely reported that the "Delta variant" is presently the more prevalent strain of the virus, and we know that the vaccine does not protect against this mutation of the virus. Thus, testing the bodily fluids of only those students who have not been vaccinated does not serve the purported end of identifying and curtailing an outbreak of COVID-19 on campus. We are not suggesting that the entire campus be subjected to this testing, however. As detailed in the Complaint and in the Declaration of Dr. Paul Alexander submitted herewith, the Real-Time Polymerase Chain Reaction Test was not designed to be used as a diagnostic tool and, in fact,

---

[1] *See, e.g.*, Brown CM, Vostok J, Johnson H, et al. Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings - Barnstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep. ePub: 30 July 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7031e2external icon

serves no purposes whatsoever unless used upon symptomatic persons to identify the likely cause of the signs of illness the individual is already exhibiting.

  The second prong of the test in determining if circumventing the Fourth Amendment can be justified in a particular circumstance, to wit: whether the requirement of individualized suspicion would place the "important governmental interest" in jeopardy, is also not met here. On the contrary, insofar as use of the RT-PCR test is explicitly recommended for use only in symptomatic persons and upon the advice of the test subject's physician, abandoning the individualized suspicion requirement undermines any usefulness of the Policy in identifying COVID-19 infection and curtailing outbreak. Further, abandoning the individualized suspicion requirement places the students in grave danger of the loss of additional freedoms since the consequences of a positive test result – even if not combined with actual symptoms of illness nor confirmed by a doctor – would likely result in quarantine and effective expulsion from the University until further notice. This intrusion into students' bodily autonomy is wholly unjustified.

  "[E] even in a pandemic, the Constitution cannot be put away and forgotten." Roman Catholic Diocese v. Cuomo (2020) ___U.S.___, 141 S.Ct. 63, 68, 208 L.Ed.2d 206, 210. This Court has no alternative but to enjoin Defendants from this plainly unconstitutional forced "surveillance testing" program.

  2. <u>Defendants' Policy Substantially Burdens Plaintiff Ryan Khanthaphixay's Free Exercise of Religion and is Not Neutral or Generally Applicable</u>

  Our nation has a long history of respecting individuals' right to practice and live out their respective faith traditions and beliefs as they see fit. In fact, this nation was founded for the very purpose of protecting religious liberty. This was so fundamental that the founders of the nation saw fit to enshrine this right in the First Amendment contained in the Bill of Rights, which begins, "Congress shall make no

law respecting an establishment of religion, or prohibiting the free exercise thereof…" *U.S. Const. Amend. I.*

To their credit, the University has recognized the fundamental right of students to opt out of their mandatory vaccination requirement where receiving the injection conflicts with the student's sincerely held religious beliefs. However, the University has unlawfully imposed additional requirements upon students who have availed themselves of the religious exemption, which include mandatory submission to regular RT-PCR testing, relinquishing their previously established living arrangements and being confined into segregated dorms designated for only unvaccinated students, wearing face coverings, and maintaining physical distance from all other people on campus. It cannot be disputed that these restrictions and additional requirements placed upon Ryan and, others similarly situated with him, substantially burden his free exercise of religion. Moreover, insofar as the University's protocol just described only applies to students who are unvaccinated for religious (or medical) reasons, clearly the requirements sought to be enjoined are not neutral and generally applicable; students who are religious adherents are being targeted by Defendants.

There has been much discussion by the United States Supreme Court on the topic of restriction of religious exercise in this COVID-19 pandemic era. Indeed, the high court has consistently enjoined restrictions imposed by the State of California, and other states, on religious exercise based upon "a strong showing that the challenged restrictions violate 'the minimum requirement of neutrality' to religion." *Roman Catholic Diocese v. Cuomo* (2020) ___U.S.___, 141 S.Ct. 63, 208 L.Ed.2d 206 citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U. S. 520, 533. The Court has held that where, such as with California's Blueprint System, there are "myriad exceptions and accommodations for comparable activities, … the application of strict scrutiny [is required]." *Tandon v. Newsom* (2021) ___U.S.___, 141 S.Ct. 1294, 209 L.Ed.2d 355. *See also, Harvest Rock Church v. Newsom*, 592

U. S. ——, 141 S.Ct. 889, 208 L.Ed.2d 448 (2020); *South Bay*, 592 U. S. ——, 141 S.Ct. 716; *Gish v. Newsom* (2021) ___U.S.___, 141 S.Ct. 1290, 209 L.Ed.2d 30; *Gateway City* (2021) ___U.S.___, 141 S.Ct. 1460, 209 L.Ed.2d 178.

Defendants' protocol cannot survive strict scrutiny because, for the reasons outlined above and alleged in greater detail in the Complaint, no compelling governmental interest is served by targeted restrictions on unvaccinated persons and the University's protocol is not narrowly tailored. A narrowly tailored restriction would involve, perhaps, the testing of symptomatic persons without regard to vaccination status. Defendants' policies are wholly irrational and serve no purpose other than creating a stigma against persons who choose not to or are unable to be vaccinated.

### 3. Defendants' Policies Violate Plaintiffs' Right to Equal Protection Under the Law

The Fourteenth Amendment to the United States Constitution guarantees all citizens equal protection under the law. This is because America was designed to be a nation governed by laws, not men and their whims. Sadly, this fundamental premise of our system of government seems to have been thrown by the wayside to a great extent during this time of purported "emergency", where state executives and their unelected agency officials have enjoyed nearly unfettered power to make and impose admittedly arbitrary rules and restrictions upon the masses in the name of "public health". It is in this vein that Defendants have imposed certain rules and restrictions upon the segment of its student population that has sought and obtained exemption to the University's mandatory vaccination policy. While Defendants will likely argue that these students pose a heightened risk to the University community and, thus, the University's disparate treatment of them is justifiable, there is no basis for such a contention in either fact or law.

The Supreme Court has summarized Equal Protection jurisprudence this way:

> [E]qual protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.' *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961). *See, e.g., Ross v. Moffitt*, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974) ("'Equal Protection'. . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable"); *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 60, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (Stewart, J., concurring) ("[T]he basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes"). Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an "identifiable group." Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979). *Engquist v. Or. Dep't of Agric.* (2008) 553 U.S. 591, 601.

As argued above and described more fully in the Complaint, there is no real distinction to be drawn between persons who have received the COVID-19 vaccination versus those who have declined it other than the fact that the former arguably has greater certainty of immunity against contracting the virus. On the other hand, those who have not been immunized may have already had and overcome COVID-19 and/or SARS-CoV-2, and natural immunity is known to be more robust than vaccine-induced immunity.[2] In fact, the new and currently more prevalent strain of COVID-19 – the so-called Delta variant – seems to be afflicting vaccinated persons more than unvaccinated. The reasons for this phenomenon are described in the Declaration of Dr. Paul Alexander submitted herewith. Classification of vaccinated students as separate and distinct from unvaccinated students, and depriving the latter class of enjoying full and unfettered access to campus life and burdening them with additional rules and restrictions is arbitrary and capricious, and cannot stand.

  As a threshold matter, this Court must determine which level of scrutiny to apply in determining if the University's policies and protocols violated the Equal

---

[2] Alexander, Paul. 14 Months Later: A Pathway Forward. American Institute for Economic Research; 23 April 2021. DOI: https://www.aier.org/article/14-months-later-a-pathway-forward/.

Protection Clause of the Fourteenth Amendment. To this end, the Supreme Court explained in *Plyler v. Doe* (1982) 457 U.S. 202:

> [W]e have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest. In addition, we have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we have sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State. *Id.* at 216-218

Plaintiffs herein are being denied equal protection based upon their religious exercise and disability status, the latter being a suspect class and the former a fundamental right. Thus, strict scrutiny is the appropriate analysis for the Court to apply in this case.

However, even if this Court determines that strict scrutiny is not appropriate, and requires only a showing of a substantial rather than compelling interest by Defendants, the classification of and discrimination against Plaintiffs and their similarly situated peers cannot survive. As the Court recognized in *Plyler, supra*, "One of the fundamental goals of the Equal Protection Clause [is] the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." *Id.* at 221-222. Plaintiffs are equally entitled to access all University programs, benefits, activities, services, and facilities, and no compelling nor substantial interest exists to justify Defendants' segregating those students from the rest of the University population nor imposing additional restrictions or requirements upon them as a condition to that access. Through the imposition of those additional conditions and the consequences that may flow from them - such as false positive PCR test results and consequential forced quarantine and isolation, segregated living conditions marked for threats and intimidation, and the

dehumanization and social isolation forced upon Plaintiffs by mandatory masking and distancing – Defendants are creating tremendous and unjustifiable obstacles to these students' advancement based upon their individual merit.

Indeed, the Equal Protection Clause protects individual persons as much as it does groups or classifications of persons. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1* (2007) 551 U.S. 701, 743. So, even if this Court declines to recognize the campus apartheid created by the challenged University Policy, this Court must intervene to protect students Ryan Khanthaphixay and Riley O'Neal, the Plaintiffs herein, who have earned their place on campus but are now being treated unjustifiably different merely for exercising their right to exemption from vaccine mandate. They are good students, in perfect health, and their choice to not receive one of the currently available (but not FDA-approved) should not cause them to be set apart from the University community they have rightfully earned their place in.

## C. Plaintiffs Will Suffer Irreparable Harm If The Temporary Restraining Order And Preliminary Injunction Are Not Granted

It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Beyond that, Plaintiffs will suffer irreparable harm if they are forced to return to school with the Policy in effect. Both will be immediately segregated from their vaccinated peers and branded as unvaccinated, since they have been forced to pull out of "combined" living situations and forced to live off-campus or on-campus in the "unvaccinated-only" dorm with other unvaccinated students, and wear face coverings.

Plaintiffs, and other exempted students, will also be required to undergo nasal anterior PCR Testing immediately prior to returning to campus, and will immediately be subjected to testing at least two times per week upon their return. These testing requirements present a particular issue for Plaintiff Riley O'Neal, whose medical condition might also prevent him from being tested, and for both

Plaintiffs in that the tests will be collecting their private genetic material and information uploaded into a database and information shared with public health authorities. In addition of the threat to their bodily autonomy and medical privacy, there is a real threat of a false positive test result, which, in turn, may result in Plaintiffs being barred from University classes, housing, and activities altogether.

It is not only discriminatory that these requirements applied only to exempted students, but it is also dangerous. The undergraduate LMU community is small (approximately 6,778 students) and most students know each other. If not, it is easy to identify a particular student via LMU's private Facebook group where students have shown themselves to be extremely vocal, and malicious (*e.g.,* during the 2020 presidential election). Exempted students can – and likely will – be targeted online, as well as on campus, even in what should be the "comfort" of their own homes.

Plaintiffs articulate these and other imminent harms in their Declarations submitted herewith.

### D. The Balance Of Equities Tips Sharply In Plaintiffs' Favor

"Traditional standards for granting a preliminary injunction impose a duty on the court to balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *Los Angeles Memorial Coliseum Com. v. National Football League* (9th Cir. 1980) 634 F.2d 1197, 1203. It is anticipated that Defendants will argue that a balancing of the equities tips in their favor because of the harm that could be caused by a COVID-19 outbreak on campus. However, this Court should be wary of state actors coming before its time and time again justifying its intrusion on individual liberties by purported public health concerns. The Court need not dismiss the legitimacy of concern for public health to look past the smoke screen that invoking this interest provides blanket justification for the erosion of well-established rights.

As set forth in the Complaint, it is clear that college-age students are at negligible risk of harm from COVID-19. Moreover, if Defendants are operating from the premise that vaccination is an effective way to protect oneself from the effects of COVID-19 infection, then it logically follows there is no actual risk to anyone on campus other than those students and faculty who have chosen not to be vaccinated and, pursuant to University policy, accepted the risk of harm and liability that flows from that choice. Insofar as the University has already granted Plaintiffs exemption from the vaccine requirement, the only potential harms to be factored into the Court's balancing are those that may arise from elimination or suspension of the RT-PCR testing requirement, segregating unvaccinated students in separate dorms, and the elimination of masking and social distancing requirements (insofar as they apply only to unvaccinated students as opposed to the entire student body). As described at length in the Complaint and the expert Declaration submitted herewith, the PCR test is not an effective diagnostic tool. The RT-PCR tests are notorious for yielding false positive results because of the cycle threshold used in analyzing the specimen and the inevitable detection of particles of dead virus, which in turn leads to a positive result. A positive result on an RT-PCR test does not indicate that the test subject is infected with or a transmitter of COVID-19 or SARS-CoV-2. If the University's testing policy is not enjoined, and due to the strong likelihood of false positive results, unvaccinated students are at dire risk of being expelled from campus and having their academic progress severely, detrimentally impacted. This is a discriminatory, unjustifiable practice that must be enjoined. Like testing, universal masking of healthy persons serves no legitimate purpose. Conversely, enjoining such a policy poses no risk of harm to anyone because neither cloth masks nor surgical masks protect against viral transmission[3], and the University is not requiring that all students be custom fit with and don n95 masks.

---

[3] *See, e.g.,* Werner E. Bischoff, Tanya Reid, Gregory B. Russell, Timothy R. Peters, Transocular Entry of Seasonal Influenza–Attenuated Virus Aerosols and

With respect to housing assignments, this Court must weigh not only the tangible harms but also the stigma and constitutional harms at play. After all, it is a fundamental principle of our nation's law in light of our troubled history that 'separate but equal' is inherently unequal (*See, e.g., Brown v. Bd. of Educ.* (1954) 347 U.S. 483, 495). Vaccinated and unvaccinated persons alike are capable of carrying and transmitting the virus. The only meaningful action to be taken by the University in preventing widespread infection would be to remove persons actually infected with COVID-19 from student housing until the infected student recovers from illness. There is no basis in law or fact for segregating healthy individuals. The University is segregating students based upon their religious convictions or disability, as the case may be, which irrefutably constitutes unlawful discrimination. Also, I would be remiss not to point out once again that if in fact vaccinated persons are protected from contracting and/or suffering the effects of the SARS-CoV-2 virus, then they are not endangered by residing in close quarters with individuals who may be carrying the virus. Defendants cannot have it both ways; either the vaccine works, and no additional measures need to be taken to protect vaccinated persons, or the vaccine does not work and then it is of no consequence that some students remain unvaccinated and intermingle with the campus community at-large.

### E. A Temporary Restraining Order And Preliminary Injunction Would Serve The Public Interest

"Defendants [can] make no argument that an injunction is not in the public interest. [The Ninth Circuit] agreed in *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002), that 'it is always in the public interest to prevent the violation of a party's constitutional rights.' *de Jesus Ortega Melendres v. Arpaio* (9th Cir. 2012) 695 F.3d 990, 1002 (*internal citations omitted*).

---

the Efficacy of N95 Respirators, Surgical Masks, and Eye Protection in Humans, *The Journal of Infectious Diseases*, Volume 204, Issue 2, 15 July 2011, Pages 193–199, https://doi.org/10.1093/infdis/jir238.

## IV. CONCLUSION

It is unconstitutional and unconscionable for the University to condition Plaintiffs' attendance in classes and residence in University housing - both of which have already been registered and paid for - upon Plaintiffs relinquishing their constitutionally-protected rights to bodily autonomy and freedom from unreasonable search and seizure, freedom to exercise their religion, and to not be discriminated or retaliated against for their respective statuses as religious adherents or persons afflicted with a medical condition. The student Plaintiffs have been accepted by and enrolled in the University and, therefore, have a right to unfettered access to all of its benefits without restriction.

For the aforementioned reasons, the Plaintiffs ask that this Court sign and enter the proposed Temporary Restraining Order, and issue a preliminary injunction at the appropriate time thereafter, together with such other and further relief as this Court may deem just and proper.

Respectfully submitted,

TYLER & BURSCH, LLP

Dated: August 3, 2021          /s/ Kristina S. Heuser, Esq.
                               Kristina S. Heuser